**Dawn MUZYKA, Plaintiff-Appellant,**

v.

**REMINGTON ARMS CO., INC., Defendant-Appellee.**

No. 84–1212.

United States Court of Appeals, Fifth Circuit.

Oct. 25, 1985.

Rehearing Denied Nov. 22, 1985.

Joe K. Longley, Austin, Tex., Jack Welch, Marlin, Tex., Mark L. Kincaid, Austin, Tex., for plaintiff-appellant.

Hilton H. Howell, Waco, Tex., for defendant-appellee.

Before GEE, POLITZ and WILLIAMS, Circuit Judges.

## OPINION

POLITZ, Circuit Judge.

The sole issue presented on this appeal is whether the trial court erred in excluding, under Rule 407 of the Federal Rules of Evidence, evidence of a subsequent design change to a rifle. In this diversity jurisdiction strict liability case, Dawn Muzyka seeks recovery from Remington Arms Co., Inc., for injuries sustained as a consequence of an accidental firing of a Remington 700 ADL, .22–250 calibre, magazine-fed bolt-action rifle. In her state court complaint, removed by Remington to federal court, Muzyka contended that the two-position, bolt-lock safety on the rifle was defectively designed and unreasonably dangerous. The jury returned a verdict in favor of Remington. Muzyka appeals the denial of her motion for new trial. We vacate and remand.

## FACTS

On August 16, 1981, a few days after the death of her husband, Mrs. Muzyka was packing, preparatory to moving with her three small children to live with her grandparents. The packing was being assisted by other family members, including her stepfather, David Melton. Melton first removed and packed two guns from a gun cabinet and then reached the rifle in question. Not knowing if the rifle was loaded, Melton partially opened the bolt to examine the chamber and magazine. Seeing one or more rounds, Melton fully opened the bolt in order to unload the weapon. On this particular Remington rifle, which then employed a two-position, bolt-lock safety, it was necessary to place the safety in the "fire" position in order to work the bolt. Since this model did not have a floor-plate, which would have permitted the emptying of the magazine from underneath without

taking the gun off safety, the rifle could only be unloaded by working the bolt, with the safety off, thereby ejecting the shells. Melton testified that he first ejected three shells and, believing the rifle empty, pushed the bolt forward and began to turn the bolt down, toward the locked position, when the rifle fired. The bullet ricocheted and struck Dawn Muzyka.

Muzyka claimed that the rifle was unreasonably dangerous because the bolt-action design required that the rifle be placed in the "fire" position, *i.e.*, the safety-off position, before it could be unloaded. A few months after the subject accident, Remington adopted a new design for its Model 700 series which now permits the working of the bolt to unload the weapon with the safety on. It is no longer necessary to put this rifle in the ready-to-fire position in order to unload it.

The jury received evidence of the rifle's bolt-action design but the court excluded evidence of the new design. By an *in limine* motion, Remington secured this exclusion of evidence under Fed.R.Evid. 407.[1] We find no error in that exclusion.

The excellence of the safety features of the Remington Model 700 rifle constituted the core of the defense. In the opening statement, defense counsel informed the jury of Remington's defense, stating: "We contend under the evidence that we expect you to hear that the Remington Model 700 rifle is one of the most popular, best, strongest, safest rifles that has been manufactured on the market." Remington offered testimony that the two-position, bolt-lock safety was the best safety available— indeed, that it was the best and the safest rifle on the market. As this evidence was offered by Remington, counsel for Muzyka sought to introduce evidence of the subsequent design change to impeach the asser-

---

1. Fed.R.Evid. 407 provides:

   When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subse-

   quent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

   We have held that this rule applies in strict liability cases. *Grenada Steel Industries v. Alabama Oxygen Co.,* 695 F.2d 883 (5th Cir.1983).

tions of the bolt-action's superior safety characteristics. The trial court excluded this evidence when offered for impeachment purposes.

In an effort to capture the importance attached to this evidence of excellence, and to reflect plaintiff counsel's repeated attempts to introduce evidence of design change, we set forth, at some length, extracts from the trial transcript:

Q MR. HOWELL [defense counsel]: Let me ask you, please, sir, if you have an opinion as to whether or not the presence of the bolt-lock as a feature on the Remington Model 700 Rifle so that the safety had to be moved to the off position to unload it, represented a danger to the user? Do you have an opinion?

A [defense witness]: I do not think it is a danger, no.

*    *    *    *    *    *

MR. LONGLEY [plaintiff's counsel]: May we approach the bench, Your Honor?

THE COURT: Yes, sir.

(At-the-bench discussion.)

MR. LONGLEY: ... Your Honor, where it says on page 37 he did not think it was a danger. We can show the subsequent design for improvement purposes, that they went to a new design for purposes of making a safer gun and that this new design without the bolt-lock. And we have a case directly on point on that, as far as impeachment purposes.... This is the only way I can impeach the man, what he is going into, what he did and when he did it.

MR. HOWELL: I don't believe that is impeachment. I left out, followed the Court's ruling.

MR. LONGLEY: 406, Your Honor.

THE COURT: Allows for impeachments. I know what it does. For the purpose of the record, proffer it outside the presence of the jury.

(End of at-the-bench discussion.)

*    *    *    *    *    *

Q [defense counsel]: And by 1981, had it become the biggest selling and most popular rifle in the world?

A [defense witness]: Yes. Very definitely. It sold in greater numbers by far than any of its competition. And it really is the rifle that all other rifle manufacturers measure their products in comparison.

Q Would you explain that?

A Well, in quality, in sales, in safety, every facet the Remington is the premier rifle, bolt-action rifle in the country today. It has the highest sales.

Q Was that true in the period from 1965 through 1981?

A Absolutely.

*    *    *    *    *    *

MR. LONGLEY: May we approach the bench, Your Honor?

(At-the-bench discussion.)

MR. LONGLEY: I'm going to try again, Judge.

THE COURT: I know that.

MR. LONGLEY: The testimony has been from this witness that the Model 700 without, with the bolt-lock device is the most popular bolt-action rifle through today, in order to quote from the record. Then he called the three-position bolt-lock a highly undesirable feature. Having made the other statement, and then he stated in reference to response to these articles that Mr. Howell has read from that, and these were all pre-1981 articles he read from, and that those are all authoritative about this being such a wonderful model, and that a model with that kind of bolt-lock is no longer available on the market. And for impeachment purposes, Your Honor, I wish to go into the design change that has been made by Remington so that we can show the jury what is going on here with regard to changes being made, that this particular model is no longer available. And if it was so undesirable, why did they go to it in the first place. And if it is popular as always right through today, there has been no change in popularity, the public accepted this as well as the

other model. I seek to make that proof, Your Honor.

THE COURT: We are getting pretty close. We may be misleading the jury.

MR. HOWELL: Of course, I think the bolt-lock rifle is by far the most popular rifle on the market. There are by far more of those bolt-lock—

THE COURT: I'm going to deny it. Don't keep talking, I may change my mind.

(End of at-the-bench discussion.)

\*    \*    \*    \*    \*    \*

Q [defense counsel]: Would you rate on a scale of one to ten between shotguns and bolt-action rifles, with one being the least safe or even dangerous, and with ten being the ultimate best safety that you know of on let's say just on bolt-action rifles, just bolt-action rifles, bolt-action sporting rifles from 1965 through 1981, would you rate on a scale of one to ten, with one being the least, the least good safety, and ten being the best, the Remington Model 700 two-position safety with bolt-lock?

A [defense witness] Nothing can be a ten. I would rate it like 9.8 or 9.9.

Q Do you know of any safety system on a bolt-action rifle marketed in that period of time that in your opinion was superior to the Remington Model 700, two-position safety and bolt-lock?

A No, sir.

Q From the standpoint of safety, reliability, usage, in every consideration?

A Absolutely nothing, no.

\*    \*    \*    \*    \*    \*

MR. LONGLEY: May we approach the bench, Your Honor?

THE COURT: You may.

(At-the-bench discussion.)

MR. LONGLEY: Your Honor, this is not limited to time. This witness stated Weatherby would not use the two-position or bolt-lock unless this was most desirable, he rated the two-position bolt-lock 9.8 or nine instead of ten. It is not limited as to time. I wish, Your Honor, to go into the changes in design so that I

may show impeachment of this witness and impeachment of Remington as to what they have done.

THE COURT: There wasn't any limit as to time, and the question wasn't asked that way, wasn't mentioned that way. The ruling is the same.

(End of at-the-bench discussion.)

The stressing of the importance of the excellence of the two-position safety, which Remington had abandoned in its 1981 design change, continued into closing argument when defense counsel argued to the jury that a preeminent rifle authority considered it "the best combination of safety and operation yet devised." Defense counsel stated:

Can you name a rifle with a two position safety that has been manufactured in the last 20 years that you don't have to take off safe to unload it? No, I cannot. There may be some, but I cannot. I mean you, you want Remington to depart from the judgment of the entire firearms industry according to your view, and make it different from everybody else's when it is—I think the evidence shows the most popular rifle in the whole world, the rifle against which other rifles are judged? And according to a preeminent rifle authority with a safety device that is perhaps the best combination of safety and operation yet devised....

MR. LONGLEY: Excuse me, Your Honor. Your Honor, I wish the court would note the argument counsel just made.

THE COURT: It is noted.

\*    \*    \*    \*    \*    \*

MR. HOWELL: So when you are talking about wouldn't it be safer, safer, safer—yes, and you are talking refinements of safety in one of the best rifles, maybe the best production rifle ever designed in the world, and we almost had to—I think we have come close to proving, I would suggest to you, that the Remington Model 700 is the best rifle and the safety is the safest safety, it is the safest bolt-action rifle.

MR. LONGLEY: Your Honor, I wish to note the argument at this point also.

As noted, the jury returned a verdict in favor of Remington. Ruling on Muzyka's motion for a new trial, the judge indicated that the evidence should have been admitted for purposes of impeachment. "It is true that throughout the trial and especially in final argument defense counsel made remarks which could have been misleading without the jury's knowing of the 1981 design change of the rifle in question...." But the trial judge viewed the error as harmless. "[T]he Court would not hesitate to grant Plaintiff's Motion for New Trial except for the fact that the jury found a third party's negligence to have been the *sole* cause of the accident."

## ANALYSIS

■ Although counsel for Muzyka argues forcefully that the evidence of design-change should have been allowed to prove feasibility or causation, we are not prepared to say that the trial court erred in its original ruling excluding the evidence. But we are persuaded that in light of the posture of the defense, and the manner in which the evidence unfolded, especially in light of defense counsel's opening statement and closing argument, evidence of the design-change should have been permitted for purposes of impeachment. That allowance would have been consistent with both the letter and spirit of Fed.R.Evid. 407.

■ Rulings on admissibility of evidence are entrusted to the broad discretion of the trial court. *Consolidated Grain & Barge Co. v. Marcona Conveyor*, 716 F.2d 1077 (5th Cir.1983); *Young v. Illinois Central Gulf R. Co.*, 618 F.2d 332 (5th Cir.1980). On appellate review, we will reverse the district court for an error in an evidentiary ruling only if a substantial right of a party is affected. Fed.R.Evid. 103(a); Fed.R. Civ.P. 61; *Pregeant v. Pan American World Airways, Inc.*, 762 F.2d 1245 (5th Cir.1985). The district court voiced second

thoughts about excluding the evidence, but in denying the motion for a new trial expressed the view that if error was made, it was harmless. We must disagree with this assessment. As we held in *Johnson v. William C. Ellis & Sons Iron Works*, 609 F.2d 820, 823 (5th Cir.1980): "It is not for us to decide that the effect of what was excluded might not have altered the jury's views.... [I]f there is a reasonable likelihood that a substantial right was affected, we should not find the error harmless."

It is obvious from the record that the rifle discharged unexpectedly. As posited to the jury, the rifle fired for one of two reasons—either Melton accidentally touched the trigger or, as he testified, the rifle malfunctioned and the weapon fired as he moved the bolt into the down and lock position. The jury received the evidence about Melton's method of handling and attempting to unload the rifle. The jury heard considerable expert testimony about the design and function of the bolt and the safety. The jury was told that the Remington Model 700 rifle was not only a fine and safe gun but that it was the standard against which all competition was measured and that it embodied the ultimate in gun safety. The rifle was described as the premier rifle, *the* best and *the* safest rifle of its kind on the market. The three-position safety which allows the unloading of the gun with the safety on was disparaged by defense witnesses.

Having received that evidence, the jury was denied evidence in impeachment of the experts who spoke in those superlatives. The witnesses were not asked to explain why the safety on the Model 700 series was changed within weeks of the subject accident. They may have had reasons why the safety and the bolt operation on the safest and best and most popular rifle was redesigned. They may have had reasons why the three-position safety became acceptable. Whatever those reasons, we are persuaded that the jury was entitled to hear them and to evaluate and weigh that evi-

dence when it made its basic decision as to the more probable reason for the tragic accidental discharge of the Remington .22–250 rifle. Was it an unintentional touching of the trigger or did the rifle malfunction? Viewed in that light, we must conclude that exclusion of the evidence of redesign, offered for impeachment, resulted in "a reasonable likelihood that a substantial right [of Dawn Muzyka] was affected." *Johnson*, 609 F.2d at 823.

The verdict and judgment in favor of Remington Arms Co., Inc. is VACATED and the cause is REMANDED for a new trial.

GEE, Circuit Judge, dissenting.

I find myself unable to join the majority in its disposition of this appeal. A jury, well aware that the design change in question was feasible (Remington admitted it at trial), determined that the act of Mrs. Muzyka's stepfather in running live ammunition through the chamber of a rifle—indoors, in her company, and with the gun's safety in the "fire" position—was negligence and the *sole* cause of her injury. That the rifle could have been designed so that even such carelessness would not have caused her injury was undisputed and conceded. Like the trial judge, who heard the evidence and observed both jury and witnesses, I cannot believe that evidence of the subsequent design change by Remington would have altered this jury finding.

Either the jury did not believe the family's account of how the accident happened, or it believed that Mr. Melton's knowing adoption of the unsafe procedure caused the accident. Because the jury well knew that Remington *could* have designed the rifle so that this particular accident would have been impossible, it seems to me unlikely in the extreme that evidence of Remington's later decision to adopt such a design would have influenced the jury to any significant degree. That being so, I would not disturb its verdict; I therefore respectfully dissent.